**COOPERATIVE BENEFIT ADMINISTRATORS, INC., in its capacity as a named fiduciary of the National Rural Electric Cooperative Association Long–Term Disability Plan, Plaintiff,**

v.

**Ronald I. WHITTLE, Defendant.**

**Civil Action No. 96–A–848–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 19, 1997.

·David R. Boyd, Montgomery, AL, John J. Range, Kara I. Cunningham, Washington, DC, for Plaintiff.

· Susan S. DePaola, Montgomery, AL, for Defendant.

### *MEMORANDUM OPINION*

ALBRITTON, Chief Judge.

This action concerns a dispute over long-term disability benefits. On May 20, 1996, the plaintiff/counterclaim defendant, Cooperative Benefit Administrators, Inc. ("CBA"), filed its complaint in this action. As amended on October 17, 1996, the complaint states that CBA seeks reimbursement of certain long-term disability benefits paid by the National Rural Electric Cooperative Association ("NRECA") Long–Term Disability Plan ("LTD Plan") to the defendant/counterclaim plaintiff, Ronald Whittle ("Whittle"). CBA seeks equitable relief under sections 1132(a)(3) and 1132(g) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 (1986), or alternatively, under federal common law. On November 22, 1996, Whittle filed his second amended answer and counterclaim, also

seeking equitable relief pursuant to sections 1132(a)(1)(B) and 1132(a)(3) of ERISA.

Because CBA's claims and Whittle's counterclaim arise under federal law, 29 U.S.C. § 1132(a) and federal common law, the court has jurisdiction over this matter pursuant to its federal question jurisdiction, 28 U.S.C. § 1331 and 29 U.S.C. § 1132(f). This cause is now before the court on Whittle's motion for summary judgment in his favor and against CBA on his counterclaim. Also before the court is CBA's motion for summary judgment in its favor and against Whittle on all counts in its amended complaint and on Whittle's counterclaim. Whittle's motion for summary judgment was filed on December 23, 1996, and CBA's motion for summary judgment was filed on December 24, 1996. Each party submitted a memorandum in support of his or its motion for summary judgment, a response to the other party's motion, and an evidentiary submission. CBA also submitted a reply to Whittle's response. The court has thoroughly reviewed these submissions and now finds that CBA's motion for summary judgment is due to be granted, and Whittle's motion for summary judgment is due to be denied.

### FACTS

Whittle is an employee of Pioneer Electric Cooperative ("Pioneer"), an Alabama organization with membership in the National Rural Electric Cooperative Association ("NRECA"). CBA is the claims adjudicator of certain NRECA welfare benefits plans, including the NRECA LTD Plan. The LTD Plan, an "employee welfare benefit plan" under 29 U.S.C. § 1002(1), is a self-insured long-term disability benefit plan subject to ERISA. The LTD Plan provides disability benefits to eligible participants during the participants' period of total disability. As an employee of Pioneer, Whittle participates in the LTD Plan.

In September of 1992, Whittle submitted a claim to CBA for benefits under the LTD Plan. Whittle was entitled to receive monthly benefits from the LTD Plan in the amount of two-thirds of his regular monthly earnings, less the amount of his "Non-duplication Offset" for the month. The Non-duplication Offset includes certain Social Security disability benefits paid on account of the participant's disability. Thus, the LTD Plan provides eligible participants with an amount that when added to the amount of Social Security benefits received by the participant would equal two-thirds of the participant's regular monthly earnings. The issue in this action is whether the amount of benefits payable to Whittle's spouse and children on account of his disability are to be included in the Non-duplication Offset, or whether only the benefits payable to Whittle himself should be included.

Generally, the Social Security Administration is slow to authorize disability benefits payments, and there can be a substantial amount of time between the disabling event and the first payment of Social Security disability benefits. Thus, to lessen financial hardship on participants, CBA provides participants an opportunity to receive from the LTD Plan the full two-thirds of their regular monthly earnings without the offset of projected Social Security benefits. In return, the participants must agree to reimburse the LTD Plan the amount which the LTD Plan "overpaid," "advanced," or "fronted," once the Social Security benefits are finally retroactively awarded. In his September 1992 claim form, Whittle "agree[d] to refund any monies due [the LTD Plan] as a result of any payment of benefits from [the Social Security Administration]." Amended Complaint, Ex. 1.

At the time CBA approved Whittle's claim for LTD Plan benefits, he had already applied for Social Security disability benefits, but had not furnished CBA with proof of his Social Security benefits claim. Accordingly, Whittle received a letter from CBA dated December 9, 1992, advising him that "Your long-term disability benefits are subject to offset by other benefits to which you may be entitled, including Social Security benefits. If we have not received proof of your claim for Social Security disability benefits at the time you *and your dependents* would normally be eligible for those benefits, an estimated offset will be deducted." Pl.'s Evid. Submission, Mau Decl., Ex. 1 (emphasis added). A Benefit Compensation Worksheet was en-

closed with the letter setting forth Whittle's basic monthly salary ($1953.99), the gross monthly disability benefit ($1302.73), the estimated offset ($1056.00), and the net monthly benefit owed to Whittle by the LTD Plan ($246.73). The worksheet shows that the estimated offset was calculated by projecting the Social Security disability benefits for a *family*. Whittle testified that he did not understand the worksheet's estimated offset but he did not ask anyone at Pioneer or CBA for an explanation.

Whittle accepted the opportunity to receive the full two-thirds amount from the LTD Plan while his Social Security claim was pending. On December 28, 1992, Whittle executed a Social Security Award Reimbursement Agreement in which he promised:

3. To repay CBA the amounts advanced to me *in accordance with the offset provisions of the [LTD] plan and this Reimbursement Agreement* within 30 days of *my receipt of the proceeds of any benefits,* awards, or payments recovered from Social Security.... The repayment will not exceed the amount of the benefits, awards, or payments recovered from Social Security, except that it shall include interest, costs, and attorneys' fees as provided in this Reimbursement Agreement....

...

5. In the event I do not repay CBA for the amounts advanced to me in accordance with the terms of the offset provisions of the [LTD] Plan and this Reimbursement Agreement within 30 days of *my receipt of any Social Security proceeds,* I shall also be liable for and promise to pay attorneys' fees and costs incurred in the enforcement of this Reimbursement Agreement plus eight percent interest (compounded annually from the date I received the proceeds from Social Security) on the principal amount of the benefits advanced that are not repaid to CBA within 30 days.

6. In addition to any other rights or remedies available to it under this Reimbursement Agreement or otherwise, if I fail to repay CBA within 30 days of *my receipt of any Social Security proceeds,* CBA may recoup the advanced benefits by exercising a right of setoff against any current or future benefits payable to me under the LTD Plan.... CBA shall be entitled to setoff the principal amount of the benefits advanced plus interest at eight percent compounded annually and any costs and attorneys' fees associated with recouping the advanced benefits.

Amended Complaint, Ex. 2 (emphasis added). In accordance with Whittle's request to be advanced the amount of Social Security benefits he would later receive, CBA began paying Whittle a benefit of $1,302.73 per month, which represented two-thirds of his pre-disability monthly earnings.

In January of 1993, Whittle went to his employer and allegedly requested a copy of the LTD Plan "policy," because he had allegedly signed the Reimbursement Agreement without fully understanding the terms of that agreement. Whittle was given a copy of a section from the "Administrative Manual for NRECA Employee Benefit Programs" ("Administrative Manual"). The section was entitled "ElectraWage LT Disability Plan." The Administrative Manual was given to certain Pioneer employees to assist them in their responsibilities of, among other things, enrolling participants in the LTD Plan, distributing plan materials to employees, assisting employees in filing claims, and providing information to employees of available benefits. Upon request, employees of Pioneer are allowed to review and have copies of sections of the Administrative Manual. The section given to Whittle provided as follows:

*The Total Monthly Disability Benefit* equals 66 2/3 % of the employee's predisability monthly earnings, with a maximum monthly benefit of $5000 and a minimum monthly benefit of $65. This benefit would be reduced by any *other periodic benefits* to which the *employee may be entitled,* such as Social Security Benefits, Workers' Compensation, or retirement benefits (with the exception of the NRECA Retirement & Security Program).

Deposition of Whittle, Ex. 1A (Administrative Manual) (emphasis added). Also, NRE-

CA provided Pioneer with the "Employee Benefit Plans Handbook" ("Handbook"). Whittle claims that he never saw the Handbook until sometime after July of 1996 when a copy of a section of the Handbook was produced by CBA as a part of discovery in this action. In regard to reimbursement of Social Security benefits, the Handbook provides:

> **INTEGRATION WITH *OTHER PERIODIC BENEFITS*** —Your total disability monthly benefit will be reduced by certain *other periodic benefits* to which you may be entitled. These *"other periodic benefits"* are:
>
> . . .
>
> (C) Periodic benefits for loss of time on account of your disability, under or by reason of:
>
> . . .
>
> (2) the United States Social Security Act, excluding benefits paid to your former spouse or to your child living with such former spouse;
>
> . . .
>
> the *"other periodic benefits" include payments from the above sources to your spouse or children on the basis of your employment and earnings record or that would be payable upon timely pursuit of claim therefor.*

Deposition of Whittle, Ex. 2, Handbook at 31–32 (emphasis added). A Pioneer employee testified on deposition that it was Pioneer's practice and custom to give a copy of the Handbook to new Pioneer employees when they first become employed at Pioneer. However, Whittle had been employed with Pioneer for some time before it adopted the LTD Plan. Two Pioneer employees also testified that in or about 1990, NRECA sent Pioneer boxes of Handbooks for the employees. While neither employee could say for certain that Whittle received a Handbook, their testimony supports the inference that Whittle did receive the Handbook. An exact number of Handbooks was distributed by Whittle's supervisor to the employees under her supervision. No employees reported not receiving a Handbook, and no Handbooks were returned undelivered. Whittle denies receiving the Handbook. Whittle never reviewed the actual LTD Plan policy, and it was never provided to him.

More than two years after Whittle signed the Reimbursement Agreement, the Social Security Administration determined that Whittle was eligible to receive Social Security disability benefits for a disability period beginning in December of 1992. On April 18, 1994, Whittle was retroactively awarded $13,480 in Social Security disability benefits for the period from December 1992 through March 1994. Whittle's monthly disability benefit from the Social Security Administration was $837.90, exclusive of cost-of-living adjustments.

On April 28, 1994, CBA informed Whittle by letter that it was aware of Whittle's approval for Social Security disability benefits. Mau Decl., Ex. 2. The letter instructed Whittle that "when you receive your check from the Social Security Administration for your retroactive benefits, please retain the money for repayment to [CBA]. As soon as we have been advised of the amount of your benefit, we will calculate the amount of the overpayment and notify you." *Id.* The letter also stated that "Your dependents will also be entitled to Social Security disability benefits based on your disability and earnings record. You should apply for these benefits as soon as possible and provide us with a copy of the notices of awards when received. *Your dependents' benefits are also subject to offset from your long-term disability benefits." Id.* (emphasis added).

On May 11, 1994, CBA made a written demand to Whittle for reimbursement of the amount which CBA alleged Whittle had been "overpaid" due to the Social Security disability benefits award. *Id.,* Ex. 4. This letter similarly provided that *"Your dependents' Social Security disability benefits are also subject to offset from your long-term disability benefits....* Please provide us with copies of the Notices of Awards for your dependents when they are received so that the *additional overpayment* can be calculated." *Id.* (emphasis added).

Sometime after Whittle received the May 11, 1994, letter, he again went to Pioneer to request a copy of the LTD Plan "policy," and

he was told to see Teresa Lowery, a Pioneer benefits employee. Lowery copied those portions of the Administrative Manual that had to do with the LTD Plan and gave the copies to Whittle. Whittle did not read the copies or ask questions about the information while at Pioneer with Lowery. Upon returning home, Whittle discovered that the copies were just another copy of the section which he received in January of 1992. Whittle testified that Lowery told him that the Administrative Manual was all the information that she had regarding disability benefits. There is no evidence that Whittle asked, or that Lowery informed Whittle, whether his dependents' Social Security benefits were subject to offset pursuant to the LTD Plan provisions and the Reimbursement Agreement. Nor does Whittle contend that he relied on Lowery in refusing to repay his dependents' benefits. He only alleges that he relied on the Administrative Manual.

Whittle testified that his wife and children did not apply for Social Security disability benefits until after he had been awarded benefits and after CBA had informed him that his dependents' benefits were subject to offset. Whittle also testified that after reviewing the Administrative Manual this second time and after reviewing the Reimbursement Agreement, he determined on his own that only his Social Security benefits were subject to offset, despite CBA's letters indicating otherwise, and he decided that he would not pay any dependents' Social Security disability benefits to CBA. During 1994, Whittle never called or wrote CBA asking for information on whether his dependents' benefits were subject to offset. Nor is there any evidence that he asked any Pioneer employee for this specific information.

Whittle did not reimburse CBA the amount of Social Security disability benefits he had received within thirty days of the date of receipt as agreed in the Reimbursement Agreement. Thus, on July 11, 1994, CBA wrote Whittle informing him that CBA was suspending his long-term disability benefits in order to recover the benefit overpayment plus eight percent per annum. *Id.*, Ex. 5. This letter also reminded Whittle that his dependents' benefits were subject to offset and that he had a duty to keep CBA informed of the status of the dependents' claims. *Id.* The letter informed Whittle that his benefits were being suspended also because he had failed to respond to CBA's requests for medical information regarding Whittle's continuing disability. *Id.* The letter also informed Whittle of his right to appeal and the method of appealing the suspension, and it stated that if Whittle failed to comply with these requests, his benefits claim would be referred to an attorney for collection of the benefits overpayment. *Id.* In October of 1994, Whittle refunded to CBA $12,082.81, and his benefits were subsequently reinstated.

On November 12, 1994, Whittle's wife was awarded $1,859 in Social Security disability benefits for the period from December 1992 through September 1994, and Whittle's children were awarded $7,384 for the same period. Each of Whittle's dependents received monthly Social Security disability benefits in the amount of $83.70. CBA continued to send demands to Whittle that he advise CBA about the status of the Social Security benefits claimed by his wife and children.

On April 4, 1995, CBA advised Whittle that, due to his failure to respond to CBA's requests for information on the status of his dependents' Social Security benefits claims, CBA would suspend his LTD Plan benefits, and these LTD Plan benefits would be applied to the amount which CBA alleged it had overpaid Whittle. On June 8, 1995, Whittle informed CBA in writing that he did not intend to repay CBA the amount of his dependents' Social Security benefits awards because he claimed that those benefits were paid to and belonged to his dependents.

The LTD Plan paid $22,176.16 to Whittle during the period of December 1992 through June 1994. Subtracting the offset for Social Security benefits payable to Whittle and his dependents, Whittle was entitled to receive $2,620.01 from the LTD Plan for the same period. Thus, Whittle was overpaid by the plan by $19,556.15. Currently, Whittle has repaid $12,082.81, leaving an overpayment by CBA of $7,473.34.

Whittle claims that his refusal to pay was in reliance on the section of the Administra-

tive Manual which he had received. He testified on deposition that if he had known that the Social Security disability benefits paid to his wife and children were subject to the Reimbursement Agreement, he would not have used their Social Security benefits for household expenditures and would have made necessary spending restrictions in order to live within the means available to him.

CBA claims that by advancing Whittle the full two-thirds of his normal monthly earnings as disability benefits—including the portion for which the Social Security Administration was ultimately responsible—it paid $19,556.15 more than it was obligated to pay to Whittle. CBA alleges that it advanced the money to Whittle in return for his executing the Reimbursement Agreement in which Whittle promised "[t]o repay CBA the amounts advanced to [him] in accordance with the offset provisions of the [LTD] Plan and [the] Reimbursement Agreement...." Amended Complaint, Ex. 2. CBA further alleges that of the $19,556.15, Whittle has refused to repay $7,473.34, representing the amount of Social Security disability benefits paid to Whittle's dependents on account of Whittle's disability. CBA claims that Whittle has acted in bad faith and in violation of the LTD Plan's terms in failing to repay the $7,473.34 and that Whittle has unjustly enriched himself at the expense of the LTD Plan and its other participants. CBA bases its recovery of the $7,473.34 on ERISA provisions, 29 U.S.C. §§ 1132(a)(3) and 1132(g), and requests the court to order Whittle to reimburse CBA that amount, plus pre- and post-judgment interest, costs, and attorneys' fees. Alternatively, CBA seeks recovery on a claim of unjust enrichment under the federal common law of ERISA and requests the same relief from the court.

Whittle's counterclaim seeks to enforce his rights under the LTD Plan pursuant to ERISA provisions, 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3). Whittle alleges that CBA's alleged failure to honor the terms of the Administrative Manual, which he argues is a Summary Plan Description, was done in bad faith and without regard for well-settled law. Whittle asks the court for a declaration that under the terms of the LTD

Plan, he is not required to reimburse CBA for the amount of Social Security benefits paid to his dependents. He also requests a declaration from the court stating that his disability benefits under the LTD Plan have been wrongfully withheld from him, and he seeks an order requiring CBA to immediately pay him these withheld benefits. Finally, Whittle asks the court to order CBA to reinstate him as a participant in the LTD Plan, to pay the costs of this action, and to pay his attorney's fees.

## STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be

believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### ANALYSIS

#### A. Motions for Summary Judgment on Whittle's Counterclaim

Whittle moves for summary judgment in his favor and against CBA on Count One—the sole count—of his Counterclaim. CBA moves for summary judgment in its favor and against Whittle on this count. In his Counterclaim, Whittle seeks a declaratory judgment stating that, under the terms of the LTD Plan, he is not required to reimburse CBA the amount paid to his wife and children in Social Security disability benefits. Whittle also seeks a declaration that CBA has wrongfully withheld his benefits in an effort to reimburse itself for the amount it allegedly overpaid Whittle. Pursuant to such a declaration, Whittle asks the Court to order CBA to pay the withheld benefits plus interest and to reinstate him as a participant in the LTD Plan.

Contrary to his claim that the terms of the plan do not require reimbursement, Whittle now concedes that the underlying plan documents do require reimbursement of benefits received by the spouse and children of the beneficiary. Countercl. Pl.'s Memo. in Supp. of Mot. for Summ.J., filed December 23, 1996, at 7 n. 4. His real claim for declaratory judgment lies in some other legal theory, such as equitable estoppel. Whittle frames the issue for the court as "whether, as a matter of law, [Whittle] is entitled to rely upon the document provided to him by his employer, acting on behalf of [CBA], when he requested that document at the time his illness arose for the specific purpose of determining what his rights and obligations under the plan might be." Id. at 6. Whittle asserts that an administrator, such as CBA,

has a duty to communicate accurate information to plan participants, and that CBA negligently or recklessly breached this duty. Whittle does not contend that CBA intentionally misrepresented any information.

CBA responds with three arguments. First, CBA contends that the Administrative Manual is not an official plan document and that the particular section of the Administrative Manual upon which Whittle allegedly relied is insufficient to change the terms of the plan. Pl.'s Opp'n to Def.'s Mot. for Summ.J., filed January 14, 1997, at 5. Second, CBA argues that even if the Administrative Manual were an official plan document, Whittle's reliance thereon was unreasonable or not justifiable. *Id.* at 7. Finally, CBA asserts that material facts are in dispute which prevent Whittle from succeeding on his motion for summary judgment. *Id.* at 10. These disputed facts concern whether Whittle had notice of and/or received the LTD Plan's Summary Plan Description ("SPD")—the Handbook—or a particular color brochure regarding the LTD Plan, both of which expressly provide that dependents' benefits are subject to offset.

Welfare benefit plans, such as the LTD Plan, must be governed by formal plan documents which are to be prepared, filed, reported, and disclosed in accordance with the statutory provisions of ERISA. *Alday v. Container Corp. of Am.,* 906 F.2d 660, 665 (11th Cir.1990). Participants of welfare benefit plans governed by ERISA are informed of the terms and benefits of such plans by formal plan documents known as a Summary Plan Descriptions ("SPD"). *Alday,* 906 F.2d at 665 (citing 29 U.S.C. §§ 1022(a) and 1102; 29 C.F.R. § 2520.102–2). The rights or liabilities of participants under the terms of a welfare benefit plan can be determined by looking only to formal plan documents (*i.e.* the plan itself or the SPD). *Id.*

Whittle asserts that the provisions of the Administrative Manual are sufficiently definite such that the court should find the Administrative Manual to be the LTD's SPD. If the manual is an SPD, and Whittle reasonably relied on the manual, then Whittle would be correct in stating that the terms of the Administrative Manual govern the plan.

For a document to be considered an SPD, it must fulfill the requirements for SPDs as described in 29 U.S.C. § 1022. *Id.; Hicks v. Fleming Cos., Inc.*, 961 F.2d 537, 542 (5th Cir.1992) (holding that a document is an SPD if "it contains all or substantially all categories of information required under 29 U.S.C. § 1022(b) and the [Department of Labor's] regulations at 29 C.F.R. § 2520.102–3 for the type of benefit in question") The rationale for requiring a document to conform to the statutory requirements of ERISA in order to be an SPD was discussed in *Hicks:*

> ... We emphasize that [the Department of Labor's] regulations at § 2520.102–3 are especially critical to this determination because they expand on the requirements in § 1022(b) and clarify the information required for each type of benefit plan.[17] [Footnote 17: "Although we leave open the possibility that a document containing not all but substantially all information required under ERISA and its regulations might be an SPD under ERISA, we believe that such a case would be the exception not the rule. Such a situation might arise, for example, if a plan sponsor intends a document to be an SPD, states that it is an SPD, and includes in the document most information required under ERISA and its regulations, but, perhaps due to inadvertence, omits some small item of required information."]
>
> In large part, we adopt this bright-line approach because we are unwilling to declare that a document could constitute an SPD under ERISA even though it does not satisfy the information requirements in § 1022(b) and § 2520.102–3, and, thus, would not be accepted by the Secretary of Labor for filing and publication. If a document is to be afforded the legal effects of an SPD, such as conferring benefits when it is at variance with the plan itself, that document should be sufficient constitute an SPD for filing and qualification purposes. Quite simply, there should be no accidental or inadvertent SPDs.

*Hicks*, 961 F.2d at 542. The *Hicks* court rejected an approach which would have allowed a document, regardless of its content, to have the status of SPD if the plan partici-

pant reasonably relied upon the document. *Id.* The court held that such a test, inevitably involving "hair-splitting factual distinctions and litigation-encouraging ambiguities," would cause "considerable uncertainty in this area of the law, to the ultimate detriment ... of all parties." *Id.*

The Administrative Manual, which Whittle claims to have sufficient information to be considered an SPD, does not contain all of the information required by § 1022(b) and § 2520.102–3. The manual does contain some of the information required by those sections such as the name of the plan, the name and address of the employers' association (*i.e.*, the NRECA), the type of plan, the name, address, and telephone number of the plan administrator (*i.e.*, CBA), eligibility requirements for participation and for benefits, procedures for presenting claims for benefits, and procedures for appealing the denial of claims. However, the manual does not include certain information required by the sections such as the employer's IRS-assigned identification number, the plan number assigned by NRECA, the name and address of the agent for service of legal process, a statement that service of legal process can be made upon a plan trustee or the plan administrator, the name, title, and address of each trustee of the plan, the identity of any funding medium used for the accumulation of assets through which benefits are paid, the date of the end of the plan's fiscal year, and most importantly, a statement of ERISA rights. Also, the manual fails to include a clear statement of circumstances which may result in disqualification, ineligibility, denial, loss, forfeiture, or suspension of any benefits. The manual merely directs the reader to other documents which list such circumstances.

An employee of NRECA declared that the Administrative Manual was not intended to be the SPD, but rather that the manual was "distributed to participating systems to assist the staff in handling the daily administrative details of their NRECA-sponsored employee benefit programs, including the LTD Plan." Pl.'s Evid. Submission, McKeithan Decl. at 5. This employee also declared that the Handbook is the LTD Plan's SPD. *Id.* The court, thus, finds that the Administrative

Manual is not and was not the LTD Plan's SPD and it has none of the special legal effects given to an SPD. This finding is based on the failure of the manual to include all of the information required by statute for a document to be an SPD, the omission of more than "some small item" of required information, the lack of intent of NRECA that the document be an SPD, and the fact that the manual is not labeled as being an SPD. *See Hicks,* 961 F.2d at 542. In addition to reading through the Administrative Manual, the court has also read through the Handbook, which CBA claims to be the LTD Plan's SPD. The court finds that the Handbook contains all of the required information described in sections 1022(b) and 2520.102–3 and that it is an SPD of the LTD Plan.

■ Whittle next claims that the language in the Administrative Manual contradicts the language of the LTD Plan's formal plan documents and that the terms of the Administrative Manual control because he relied on them to his detriment. The Court of Appeals for the Eleventh Circuit's decisions in *Alday* and *Kane v. Aetna Life Ins.,* 893 F.2d 1283 (11th Cir.1990), are directly on point. In *Alday,* a plan participant argued that certain documents—other than the plan document itself and the SPD—controlled over the actual terms of the plan. The participant argued that the plan's benefits summary, letters sent to employees, and retirement seminar documents, which did not contain certain language, prevailed over the actual plan document and the SPD which did contain the language. The court of appeals held that where a SPD clearly functions as a plan document and the SPD unambiguously sets out the terms of the plan, the terms of the SPD are controlling and other documents, whether "official" or "informal," must be disregarded. *Alday,* 906 F.2d at 666.

The LTD Plan's SPD is the Handbook, of which the relevant portion is set out above. Although Whittle claims to have never received a copy of the Handbook, two witnesses for CBA testified on deposition that the Handbook was distributed to all employees to inform them of the terms of the plan. Even accepting Whittle's assertion that he never received the Handbook, the court finds

that the Handbook clearly functioned as the LTD Plan's SPD, a formal plan document. Moreover, as shown above, the terms of the Handbook are unambiguous in providing that benefits received by a participant's dependents are subject to offset. Thus, the terms of the Administrative Manual do not control the terms of the plan, and the Administrative Manual is insufficient to change the actual terms of the LTD Plan. To the extent that Whittle's counterclaim is based on the ground that the Administrative Manual changed the actual terms of the LTD Plan so that only his Social Security benefits were subject to offset, Whittle's motion for summary judgment in his favor and against CBA on the counterclaim is due to be denied; CBA's motion for summary judgment in its favor and against Whittle on the counterclaim is due to be granted.

■ Whittle's counterclaims for declaratory and injunctive relief are more likely based on a theory of promissory, or equitable, estoppel. An equitable estoppel claim under the federal common law may only be made if the provisions of an ERISA-governed plan are so vague that reasonable persons could interpret them differently and a representation asserting the correct interpretation is made to the employee. *Alday,* 906 F.2d at 666 (citing *Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1286–1287 (11th Cir.1990)). The terms of the LTD Plan are unambiguous. As the court has already noted, the Handbook, which is the plan's SPD, clearly provides that Social Security benefits paid to the spouse and children of a participant on account of the participant's disability will offset the participant's LTD Plan disability benefits. However, Whittle claims that he never saw the actual provisions of the plan and that he was never given the Handbook.

In 1992, Whittle agreed "[t]o repay CBA the amounts *advanced to me* in accordance with the offset provisions of the Long–Term Disability Plan and this Reimbursement Agreement within 30 days of *my* receipt of the proceeds of *any* benefits, awards, or payments recovered from Social Security...." Reimbursement Agreement ¶ 1 (emphasis added). Arguably, the Reimbursement Agreement is a part of the LTD Plan provi-

sions, especially in light of Whittle's claim that he had not received the Handbook. This provision of the Reimbursement Agreement is ambiguous and could be interpreted in either of the ways which the parties' suggest. Moreover, when Whittle requested help from the benefits employees at Pioneer regarding the interpretation of the Reimbursement Agreement, he was twice given a copy of a section of the Administrative Manual. This action by Pioneer benefits employees is sufficient to constitute an interpretation of the reimbursement provisions. The Administrative Manual provides that the offset includes "any *other periodic benefits* to which the *employee may be entitled*, such as Social Security Benefits ...." (emphasis added). This provision is as ambiguous as the provision in the Reimbursement Agreement because it could be read to mean that only the Social Security benefits paid directly to Whittle were subject to offset. Whittle would have had to read the Handbook to determine that "other periodic benefits" also includes benefits paid to his spouse and children on account of his employment. Thus, because the Reimbursement Agreement's terms are ambiguous and a Pioneer employee directed Whittle to an interpretation, Whittle is entitled to base his claims on equitable estoppel.

■ Under federal common law, a party can be estopped if it misrepresents a material fact while knowing the truth, intending or having a reason to believe that the party asserting estoppel would act on the misrepresentation, and the party asserting estoppel did not know and should not have known the truth and reasonably and detrimentally relied on the misrepresentation. *National Cos. Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc.*, 929 F.2d 1558, 1572 (11th Cir. 1991). CBA argues that Whittle could not have reasonably relied on the Administrative Manual. CBA asserts that in determining whether Whittle's reliance was reasonable, the court must look to Whittle's knowledge at the time he entered into the Reimbursement Agreement. It is clear that if this time frame is chosen, Whittle could not have relied upon the Administrative Manual because he did not receive it until the next month. Whittle argues that the reasonableness of his

reliance should be measured based upon his knowledge as of the date he declined to make the benefit repayment. Actually, Whittle's knowledge must be determined at the time of the representation and at the time when he acted upon the representation. *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 n. 10, 104 S.Ct. 2218, 2223 n. 10, 81 L.Ed.2d 42 (1984). " 'If, at the time when he acted, [Whittle] had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation....' " *Heckler*, 467 U.S. at 59 n. 10, 104 S.Ct. at 2223 n. 10 (quoting 3 J. Pomeroy, Equity Jurisprudence § 810, p. 219 (S. Symons ed.1941)).

Thus, the court must determine, if it can, whether Whittle, at the time that the Administrative Manual was given to him in January of 1992, knew, or with reasonable diligence could have known, that he was required to reimburse CBA the amount of his wife's and children's Social Security benefits. If Whittle did not know, or could not have with reasonable diligence known, at that time, then the court must determine whether Whittle knew, or could have known with reasonable diligence, at the time he acted to his detriment in alleged reliance on the Administrative Manual, that the amount of his dependents' Social Security benefits were subject to the terms of the Reimbursement Agreement and the LTD Plan's terms.

It has been held that an insurer can not be estopped from seeking reimbursement of benefits if the insurer communicated to the insured, prior to the insured's reliance on some action or inaction by the insurer, that it intended to seek reimbursement. *Unisys Medical Plan v. Timm*, 98 F.3d 971, 974 (7th Cir.1996). In *Unisys*, the insurer paid medical expenses for injuries suffered by the insured. The insurance plan required the insured to reimburse the insurer the amount of any outside compensation which the insured received for his injuries. The insured sued several parties who were allegedly responsible for his injuries, and these parties, antici-

pating a subrogation claim, impleaded the insurer. The insurer did not answer the third-party complaint because it understood that the case would be settled. Two months after being impleaded, the insurer notified the insured's attorney that it would seek reimbursement if the case settled. However, one month later, the case had not settled, and the insurer sought leave from the court to file an untimely answer to the third-party complaint. After the case finally settled, the insurer instituted a separate action seeking reimbursement under ERISA. The insured defended by raising the affirmative defense of equitable estoppel, alleging that the insurer's inaction in failing to answer the third-party complaint in the prior action misled him into thinking that the insurer would not seek reimbursement from the settlement. The court held that such reliance was unreasonable in light of the insurer's communication prior to the settlement that it would seek reimbursement and in light of the insurer's motion for leave to answer the third-party complaint prior to the settlement. *Unisys*, 98 F.3d at 974. Because reliance on the insurer's inaction was unreasonable, the insured's defense of equitable estoppel failed, and the court of appeals upheld the district court's grant of summary judgment to the insurer. *Id.*

On December 9, 1992, prior to Whittle's signing of the Reimbursement Agreement, he received a letter from CBA which stated that "Your long-term disability benefits are subject to offset by other benefits to which you may be entitled, including Social Security disability benefits. If we have not received proof of your claim for Social Security disability benefits at the time you *and your dependents* would normally be eligible for those benefits, an estimated offset will be deducted." Pl.'s Evid. Submission, Mau Decl., Ex. 1 (emphasis added). Whittle also received with that letter CBA's Benefit Compensation Worksheet which showed an estimated monthly offset for *family* Social Security benefits. *Id.* On December 28, 1992, Whittle signed the Reimbursement Agreement.

In spite of the statements made to Whittle by CBA in the month of December, 1992,

Whittle claims that he did not understand the terms of the Reimbursement Agreement to which he had already bound himself. The letter to Whittle from CBA dated December 9, 1992, closed by stating that "If there is any additional information you feel we should review or *any questions you would like to discuss, please feel free to call or write.*" Mau Decl., Ex. 1 (emphasis added). Instead of calling or writing to CBA regarding his lack of understanding of the offset provisions and of the Reimbursement Agreement, Whittle asked Pioneer employees for information on the LTD Plan or for an actual LTD Plan policy. In response, a Pioneer employee gave Whittle a copy of the LTD plan section from the Administrative Manual. There is no evidence that Whittle ever specifically asked anyone at CBA or at Pioneer whether his dependents' benefits were subject to offset. From his own interpretation of the manual, Whittle determined that his wife's and children's benefits were not subject to offset. From this evidence, the court can not find as a matter of law whether Whittle knew that his dependents' benefits were subject to offset or whether with reasonable diligence he could have known such that his failure to use diligence would constitute negligence.

Whittle would still have to prove that he reasonably relied on the Administrative Manual at the time he allegedly acted to his detriment. There is some confusion as to the identity and time of Whittle's detriment. It is undisputed that Whittle was entitled to receive $1,302.73 per month in disability benefits, regardless of the proportion paid by the Social Security Administration or the LTD Plan. Thus, Whittle was entitled to receive $1,302.73 per month both before the Social Security Administration paid his dependents' their benefits and after the benefits were paid. CBA claims that the dependents' benefits were a part of the $1,302.73, while Whittle claims that the dependents' benefits were in addition to the $1,302.73. Under either scenario, Whittle would have received at least $1,302.73 per month. Indeed, Whittle had been living off that amount since December of 1992, and he would have continued to received that amount after November of 1994, when the dependents' benefits were received. Thus, when Whittle claims that he

would have "cut back" his spending in November of 1994, if he had known that the dependents' benefits were subject to offset, he is not entirely correct. He merely would have refrained from spending these "extra" benefits, but in no way would he have had to "cut back." Therefore, Whittle's detriment is not in having failed to "cut back" in reliance on the Administrative Manual, but rather in his failure to set aside the money for repayment. Whittle was obligated under the LTD Plan and the Reimbursement Agreement to repay the dependents' benefits to CBA within thirty days of receipt of those benefits. Whittle's spouse and children were awarded the benefits in November of 1994, and thus, Whittle acted to his detriment by refusing to repay the benefits within thirty days, sometime in December of 1994. It is at this point in time when the reasonableness of Whittle's reliance must be measured. Any events after December of 1994 are irrelevant to the issue.

After Whittle received the first copy of the LTD Plan section of the Administrative Manual in January of 1992, he received no further communications from CBA regarding the dependents' benefits until April of 1994, when he received notification from CBA that it was aware of the social security Administration's award of disability benefits to Whittle. By two separate letters dated April 28, 1994, and May 11, 1994, CBA informed Whittle that his dependents should proceed to file for Social Security disability benefits if they had not done so already. The letters also included express, clear, and plain statements that these dependents' benefits were subject to offset. Whittle, understanding that there was a difference of understanding between CBA and him asked Pioneer to make him a copy of everything it had regarding the LTD Plan. At this point, Whittle received a second copy of the LTD Plan section of the Administrative Manual. There is no evidence that he ever specifically asked about the applicability of the offset provisions to his dependents' benefits. Relying on his own interpretation of what he thought was the LTD Plan "policy," Whittle determined that the dependents' benefits were not subject to offset. Whittle received a third letter from CBA dated July 11, 1994, which also stated

that his dependents' benefits were subject to offset. The letter went on to remind Whittle that he had a duty to keep CBA informed of the status of his dependents' claims for Social Security disability benefits. Whittle never informed CBA of the status of the claims, even though the letter indicated that CBA was ready to take legal action.

Like the December 9, 1992, letter, the two letters dated April 28, 1994, and May 11, 1994, concluded by stating that Whittle should call or write to CBA if he had any questions. It is obvious, and Whittle admitted, that he had some questions. Otherwise, he never would have gone to Pioneer to request information. Even at Pioneer, Whittle did not ask for help on the specific issue on which he needed help. He never called or wrote to CBA asking for any information, specifically information about the applicability of the offset provisions to his dependents' benefits. He never relied on anyone except himself in interpreting his Reimbursement Agreement.

While the court can not find that Whittle actually knew that his dependents' benefits were subject to offset, the court does find that the means were available to Whittle from which he could have discovered the truth. Whittle had ample opportunity from December of 1992 to November of 1994 to call or write to CBA concerning the questions he had about the statements in CBA's letters. Furthermore, the court finds that Whittle did not use reasonable diligence in ascertaining the truth, and he was negligent for not utilizing CBA's offer of help. A person who negligently remains can not rely on equitable estoppel. Thus, Whittle's motion for summary judgment on his counterclaim in his favor and against CBA on the theory of equitable estoppel is due to be denied; CBA's motion for summary judgment on Whittle's counterclaim in CBA's favor and against Whittle is due to be granted.

**B. CBA's Motion for Summary Judgment on the Claims in its Amended Complaint**

█ CBA bases its two claims for reimbursement of the Social Security disability

benefits received by Whittle and his dependents on the provisions of the LTD Plan and on unjust enrichment under the federal common law of ERISA. The court has already found that the provisions of the LTD Plan and the provisions of the Handbook—the plan's SPD—provide that Social Security disability benefits received by a participant's spouse and children on account of the participant's disability will be offset from the participant's LTD Plan benefit. CBA "fronted" or "advanced" Whittle the full disability benefit—including the portions that would later be recovered by Whittle and his dependents from the Social Security Administration—in return for Whittle's promise to repay the Social Security benefits when received. The court also has already found that Whittle's reliance on the Administrative Manual was not reasonable. Thus, Whittle's affirmative defense of equitable estoppel is not supported and can not overcome his duty pursuant to the Reimbursement Agreement to repay CBA. Thus, CBA's motion for summary judgment on Count One of the Amended Complaint, based on the provisions of the LTD Plan and the Reimbursement Agreement, is due to be granted in CBA's favor and against Whittle. The court need not consider Count Two of the Amended Complaint, which bases recovery on unjust enrichment under the federal common law of ERISA.

### CONCLUSION

Whittle's motion for summary judgment in his favor and against CBA on the claims in his Second Amended Counterclaim is due to be denied. CBA's motion for summary judgment in its favor and against Whittle on the claims in Whittle's Second Amended Counterclaim is due to be granted. Similarly, CBA's motion for summary judgment on Count One of its Amended Complaint is due to granted in CBA's favor and against Whittle. CBA's motion for summary judgment on Count Two of its Amended Complaint need not be considered.

In addition to recovering the principal amount ($7,473.34) of benefits advanced to Whittle that were not repaid, CBA is entitled to certain other remedies. In accordance with the Reimbursement Agreement which Whittle signed on December 28, 1992, CBA is entitled to eight percent interest on this principal amount compounded annually from the date on which Whittle or his dependents received the Social Security disability benefits to the date on which Whittle ultimately repays CBA. Furthermore, also in accordance with the Reimbursement Agreement, Whittle is obligated to pay CBA's costs and attorneys' fees that were incurred in obtaining these remedies.

A separate order will be entered in accordance with this Memorandum Opinion.

### ORDER AND JUDGMENT

In accordance with the court's Memorandum Opinion, issued this same day, it is hereby ORDERED, ADJUDGED, AND DECREED that

1. Defendant/Counterclaim Plaintiff Ronald I. Whittle's ("Whittle") Motion for Summary Judgment, filed December 23, 1996, be, and the same is hereby, DENIED;

2. Plaintiff/Counterclaim Defendant Cooperative Benefit Administrators, Inc.'s ("CBA") Motion for Summary Judgment, filed December 24, 1996, be, and the same is hereby, GRANTED in favor of CBA and against Whittle on Count One of CBA's Amended Complaint;

3. CBA's Motion for Summary Judgment on Count Two of its Amended Complaint, be, and the same is hereby, DENIED AS MOOT;

4. CBA's Motion for Summary Judgment on all claims in Whittle's Second Amended Counterclaim, be, and the same is hereby, GRANTED in favor of CBA and against Whittle;

5. Judgment is entered in favor of the Plaintiff, Cooperative Benefit Administrators, Inc. and against the Defendant, Ronald I. Whittle, in the amount of $7,473.34, plus interest at the rate of eight percent (8%) compounded annually on the unpaid amount from the date on which Whittle or his dependents received the unreimbursed Social Security disability benefits to the date on which Whittle ultimately repays CBA, plus costs and

attorneys' fees incurred by CBA in obtaining the remedies contained in this Order and Judgment. Costs are taxed against the Defendant.

6. The parties are given **until October 10, 1997,** to agree on the amount of interest, costs and attorneys' fees due under this Judgment and to file a statement of their agreement. In the absence of agreement, the court will set this case down for the receipt of evidence on this matter.